SMILEY v. SAMPSON.

# Smiley v. Sampson.

1. JURISDICTION. The power to hear and determine a matter in controversy, is jurisdiction. It is *coram judice*, whenever a case is presented which brings the power into action. It may be exercised according to the rules of the common law, or by special direction, or informally.

2. ——: *Of land officers*. The register and receivers of the local land office and their superiors in the land department, form a special tribunal for some purposes and to a certain extent.

3. ——: ——. They have jurisdiction to determine questions of settlement and improvement, between different preëmption claimants, which are questions of fact; and their decision thereon is conclusive upon the parties and the courts.

4. ——: ——. They have not jurisdiction to determine conclusively questions arising between one settler and the government, which are generally questions of law. On these questions the courts are not concluded by their decisions.

5. ——: ——. Their decision on an application to preëmpt, when made *exparte* without the presence of the party interested adversely to the applicant, is not conclusive.—*Lindsey* v. *Hawes*, 2 *Black*, 554, *examined and distinguished*.

6. FILING TWO DECLARATORY STATEMENTS. The act of Sept. 4, 1841, requires the filing of a declaratory statement of intention to preëmpt a tract of land, only when the tract claimed is subject to private entry.

7. ——. The act of March 3d, 1843, prohibits a second filing, only under the act of '41 ; *i. e.*, only on lands subject to private entry.

8. STATUTORY CONSTRUCTION. General words of a statute will be restrained, when they clearly were not intended to include a particular act or thing.

9. ——: *The mischief*. Where a matter is clearly out of the mischief intended to be guarded against, and thus is out of the spirit, although it be within the letter of the act, it is the duty of the court in construing the act, to limit the effect of the terms employed.

10. LAND IS NOT WITHDRAWN, from preëmption, by the circumstance that a company has endeavored to build a town thereon, after the enterprise has been abandoned.

Smiley *v.* Sampson.

11. Neglect of officer. The law will protect an individual who, in the prose-
    cution of a right, has done all that the law requires him to do, but fails
    to attain his right, by reason of the neglect or misconduct of a public
    officer.

12. Fraud in pre-emptions. If an indigent party give for a house standing
    on a tract of the public land, his note for $3,000, and thereupon asserts a
    preëmption claim to the tract, without making any other improvement
    thereon, and as soon as he effects his entry, conveys a large tract to the
    payee of the note, in discharge thereof, and also conveys most of the
    remainder to parties, who as witnesses and attorneys have aided him in
    securing it, and who have previously endeavored to secure it by fraudu-
    lent practices, these circumstances unexplained, justify the opinion that
    there was at the time of his first asserting his preëmption claim, an
    agreement to do what was afterwards done.

In the summer of 1857, Smiley possessing such personal
qualifications, as under the provisions of the act of Sep-
tember 4, 1841, entitled him to preëmpt a tract of the
public land, erected on the west half of the south-east
quarter of section three, and the west half of the north-
east quarter of section two, in township fifteen north, range
thirteen east of the sixth principal meridian, a substantial
dwelling and another house, and fenced an enclosure around
the same, and made some other improvements, all of the
value, and at a cost of about $1,500.

At this time an association of persons who assumed the
name of the Sulphur Springs Land Company, "claimed"
— in the parlance of the frontier — these lands, together
with several thousand acres adjoining. That is, without
any right or title derived from the United States land laws,
they assumed the proprietorship of these lands, and pre-
tended to have, although they had not in reality, possession
and occupancy thereof. The object of this company was
to build a town on these lands. They laid them off into
town lots with streets, and induced many persons to build
houses on the lots and live on them. They also issued cer-
tificates of shares as in a joint stock company, which were
held by large numbers of persons.

SMILEY *v.* SAMPSON.

Smiley's father owned one or more of these certificates. The Smiley family consisted of the plaintiff, the father and four maiden sisters. Immediately on their arrival in the Territory, with the lumber for the houses above mentioned and their household goods, they proceeded, (the plaintiff claims that he, and the defendants claim that the father proceeded) to the premises in question and built the said houses, and afterwards lived there for some time. The only other improvements upon the tract was a house built by one Gant. The tract was, like the other lands "claimed" by the Land Company, laid off into lots; but Smiley's house and enclosure was not built with any reference to the lines thereof.

Shortly after Smiley built the houses, the company caused John A. Mowrey to preëmpt under the act of September 4, 1841, the quarter section here in question, and immediately convey the same to it. In March, 1858, Mowrey's entry was returned to the local from the general land office, with directions to the register and receiver to reinvestigate his right to preëmpt; and on the 4th of June following, those officers decided against the validity of his entry. In the same month, Smiley asserted his right to preëmpt the land, by tendering to the register his declaratory statement of intention to claim the same, under the act of 4th September, 1841. The officer refused to receive the paper, on account of Mowrey's previous entry. Smiley then took steps in his own name, and on his own behalf against Mowrey's entry, and upon his caveat filed before the commissioner, it was by that officer again returned to the local office for reëxamination. The investigation commenced on the 13th of December, 1858, and was protracted till the 3d day of March, 1859. This matter was entitled "*John A. Smiley* v. *James A. Mowrey.*" The result was a decision by the register and receiver adverse to the claims urged in Mowrey's name, which they communicated to the

commissioner by their letter, dated May 19, 1859. This decision was approved by the last mentioned officer, and no subsequent efforts were afterwards made to reverse or modify it.

The ground of the decision was, that Mowrey had made the entry for the Land Company and not for himself.

At this point, the appellant Sampson first appears as a claimant of these lands. He had come to Nebraska the preceding spring, in very straightened circumstances, and rented the house on the tract built by Gant, and also a farm three miles distant, which he worked that season. In August, he filed his declaration of intention to preëmpt, adversely to Smiley, by whose persistent efforts the tract had been discharged of the fraudulent entry in Mowrey's name. On the 16th of November, 1860, the investigation ordered by the commissioner was had; and the matter was entitled "*John A. Smiley* v. *James A. Mowrey and others.*" Smiley stood on the proofs of his right taken in the former examination, and Sampson introduced proof, in support of his claims. The record thus presented was unsatisfactory to the commissioner; and on the 24th of January, 1862, he ordered a new and full examination on four points, namely: "First, the date of settlement; second, the nature and purposes of the same; third, the nature and extent of the improvements; and fourth, the date and duration of the residence of each claimant." On the 9th of June, 1862, this examination commenced before the register and receiver, and was very full and greatly protracted; and resulted in a decision by those officers in Smiley's favor. Sampson appealed to the commissioner, who on the 9th of October, affirmed the report of the local officer. Sampson appealed again to the Secretary of the Interior, who on the 11th of July, 1863, revised these decisions, and awarded the land to Sampson. The sole ground of the Secretary's decision is the fact that Smiley

had in 1857, filed his declaratoy statement of intention to preëmpt another tract of land; and had thereby exhausted his preëmption right.

Immediately after this, Gant entered up a judgment in the District Court against Sampson for $3,000, on a note made in 1860, the consideration of which is alleged to be the house above mentioned rented by him to Sampson. In a few days afterwards, and as is said, in satisfaction of this judgment, Sampson conveyed a part of the land to Gant, and also conveyed to others other parts of the land; Gant, and the other grantees being Sampson's attorney's and witnesses in the proceedings above mentioned. Tuttle who secured a part of the land was treasurer, and Patrick who secured another part was the executive committee of the Land Company.

The circumstances of Smiley's first filing, which in the Secretary's opinion exhausted his rights, under the preëmption law, were these: He came here in the spring of 1857 to find a home. He found a piece of land which appeared to be unclaimed, and filed on it. A day or two afterwards, one Creighton told him he was the claimant of it, under the regulations of the "Omaha Claim Club." This was an organization which assumed to authorize its members to "claim" three hundred and twenty acres of land, and to prevent all others, by adverse claims or preëmption rights, interfering therewith. Persons not members of it, who asserted such rights, were called "jumpers." "The Club" was composed of large numbers, and had in some cases enforced its rules by extreme violence. Smiley did not wish to come in conflict with this organization; and when he made his filing, did not know the land was so "claimed." On being informed of it, by Creighton, he immediately withdrew his filing, and never afterwards claimed the land or any interest in it.

It was claimed in the answers, and on the proofs, and

SMILEY *v.* SAMPSON.

in argument, that it appeared that Smiley, the plaintiff, did not make, but that his father made, the improvements in virtue of which he claimed his preëmption right. The plaintiff testified that he purchased the lumber and other material with which the houses were built, at Wheeling, Va., and brought them with him to Nebraska, and mostly with his own hands put up the houses; that he earned the money with which to buy the material, teaching school at Charlestown, in Virginia; that his father lived with him, and he had general care of the family, until his father died, who was buried on the tract; that his sisters lived on the tract with him, until he removed them to Omaha, where he provided for them, until they were married; that the house was always his home, although he went to Iowa to teach school, and also was engaged freighting on the plains. The defendants produced the depositions of three witnesses residing at Charlestown, to the effect that no such man ever taught school there; but in his own support, Smiley produced the depositions of four witnesses, who swear he taught school at the time claimed by him, at          , which was quite near to Charlestown.

A patent having been issued to Sampson for the lands in question, Smiley, on the 24th of September, 1864, filed his bill to recover the legal title from him and his grantees. The cause was heard on pleadings and proofs in the District Court, where on the 6th of August, 1867, a decree was rendered in favor of Smiley, according to the prayer of his bill. The defendants appealed to this court.

*J. I. Redick* for the appellants, argued the following propositions:

I. The land officers are a special tribunal, to whose decision the several questions involving the right of a claimant to preëmpt a tract of land, are, by law, finally submitted.

II. The courts cannot reëxamine these questions, when, after a full and fair trial, the parties have submitted them to the land department for adjudication.

III. Smiley did not, but his father did, make the improvements on the tract.

IV. Nor did he actually inhabit and cultivate the land.

V. The land had been selected as a town site, and was, therefore, not subject to preëmption.

*J. M. Woolworth* for appellee, argued the case upon a brief filed by himself and *A. J. Poppleton.*

I. The first question which naturally presents itself is, whether these lands were subject to preëmption. The only reason urged why they were not, is, that as is alleged, they had been selected as a site for a city or town. The allegation of the answer is, "that on the 13th day of May, 1857, the said premises were selected for the site of a city or town, and were so used and occupied at the time, and were known as the city of Saratoga." We submit that this allegation, even if true, is insufficient to take these lands out of the law, and is unsustained by proof.

1. Smiley alleges a preëmption claim dating from June, 1858, at which time the enterprise of building a town on these lands, if ever *bona fide* entertained, was completely abandoned, and the lands no longer used or occupied for that purpose.

*a.* The Sulphur Springs Land Company was the only party which ever had this enterprise in view.

*b.* This company, in June, 1858, had failed, and given up this enterprise.

*c.* There is no proof of any improvement on the land, except the house of Gant and the houses built by the complainant.

2. These houses having been built early in 1857, and no

other town improvements having ever been made, they are insufficient to withdraw this tract of one hundred and sixty acres, from the operation of the preëmption act; especially as against the repeated agricultural entries, allowed by the land department.

3. Gant himself did not claim that his house brought the tract within the exemption of the law, so as to exclude Smiley's preëmption right.

4. The Sulphur Springs Land Company never pretended that these lands were withdrawn from the operation of the law.

*a.* They never, so far as is shown, recorded any map of their survey, nor otherwise complied with the law.— 2 *Session Laws*, 43.

*b.* They procured them to be preëmpted and took title under that entry.

5. All that can possibly be claimed from what that company did, that is, the plating and staking the land into lots, was insufficient to indicate that the tract was severed from the body of the public land, and not subject to preëmption.—*In re Selby et al.* 6 *Mich.* 193.

II. The next question naturally presented for consideration, is whether Smiley had the necessary qualifications to make a valid preëmption. He is shown without dispute to have all the personal qualifications. But it is insisted that his previous filing on another tract, brings him within the exception of the act, which excludes from its privileges those who have once enjoyed its benefits. We insist that it is not true.

1. The act of 1843, 5 *U. S. Statutes at large,* 620, forbids a second filing to those only who have filed once under the act of 1841. The act of 1841, 5 *U. S. Statutes,* 457, provides for filings only on lands subject to private entry. These lands were not subject to private entry; and, there-

SMILEY v. SAMPSON.

fore, Smiley's filings were not under the act of 1841, and his second filing was not forbidden by the act of 1843.

2. The distinction between lands subject to private entry, and those which were not, is made because one man filing on several tracts of the first class withdraws them from sale, and thereby injures the government; but no such injury is sustained when the filings are on the second class, because they are not offered for sale.

3. The act of 1843 was passed to suppress frauds. Smiley did not intend any fraud, nor was the government injured by his withdrawal from the land he first took, and claiming this tract. His case is not, then, within the mischief at which the act aimed.—*Faw* v. *Marsteller*, 2 *Cranch*, 10 ; *Jackson* v. *Collins*, 3 *Cowen*, 85 ; *United States* v. *Fisher*, 2 *Cranch*, 399 ; 19 *Vin. ab.* 519 ; *Lessees of Brewer* v. *Blougher*, 14 *Peters*, 178 ; *Mayor, &c.*, v. *Lord*, 18 *Wend.* 131.

III. As regards Smiley's rights, it only remains to inquire if he has complied with the law in building a dwelling on, and inhabiting the tract. That abundant improvements were made, and that he lived there, is admitted ; but it is contended that these improvements were made by his father and not by him ; and that he lived in his father's family as his son. We claim that the proof shows that Smiley built the houses and was the real head of the family.

1. His deposition is minute, full, accurate and candid. It is incredible that his account is a fiction. He tells us : 1st, when, where and how, he earned the means of buying the material for the houses ; 2d, when and how he brought it here ; 3d, how he built the houses; on which point he is corroborated by Gise, a carpenter, who worked for him.

2. The attempt to show that he did not earn these means by teaching, is triumphantly met by the testimony of persons who knew him, when so engaged.

3. The testimony of the witnesses for the appellant, is

SMILEY *v*. SAMPSON.

not satisfactory, because : 1st, it is merely negative in its character ; 2d, the facts testified to, are all reconcilable with our views and Smiley's testimony ; 3d, those facts are not conclusive.

IV. The *bona fides* of Sampson's entry is successfully assailed, and is not vindicated by proofs on his part.

1. He comes here without means, rents Mr. Gant's house, and a farm at a distance.

2. By the sole and persistent efforts of Smiley for three years, the fraudulent entry of Mowrey is vacated ; and thereupon Sampson, being quite without means, buys this house, giving his note therefor, for $3,000, and in virtue thereof claims his preëmption right.

3. Immediately after the matter is determined in the land department, Sampson confesses judgment on the note, and a few days afterwards deeds a large part of the land to Gant, who satisfied this judgment, and, excepting a small parcel, the tract is distributed between the counsel and witnesses of Sampson in this very extraordinary proceeding.

4. Sapp, one of these attorneys, and a defendant here, boasted that he had an agreement with Sampson, prior to his entry, for a part of the tract, and afterwards received from Sampson a deed for exactly the same land.

5. These facts, unexplained, show that there was an agreement prior to the entry, by which the title to be acquired by Sampson should enure to the benefit of others, and called on the defendants for rebutting evidence. They did not furnish it, because they could not.—*Callan* v. *Statham*, 23 *How*. 477.

MASON, Ch. J.

The defendants insist that the decision of the secretary of the interior adversely to Smiley's right of preëmption,

is conclusive between the parties, and that *Lindsey* v.
*Hawes*, 2 *Black.* 554, does not apply ; because, they say,
that that case was determined by land officers *ex parte*, while
this was determined after a full and fair contest.   The dis-
tinction seems to be well taken.   In the case cited, the
facts as stated by Mr. Justice MILLER, who delivered the
opinion of the court, were these :   In April, 1859, Lindsay
applied to enter, and in June of that year he did enter, the
tract in question under the preëmption law of 1838, with
the register of the land office in Illinois.   Shortly after-
wards he removed to Iowa, and in September of the same
year, he died.   On the 9th day of August, 1845, James
Shields, commissioner of the land office, set aside the entry
of Lindsey, ordered his certificate to be cancelled, and
directed the register and receiver to hear proof of the right
of David Hawes, and to adjudicate his claim.   They
accordingly heard his proof, and gave him the certificate
on which he afterwards obtained his patent.   The difficulty
in Lindsey's entry was, that by a survey made in 1833, by
Bennet, the government surveyor,. the south line of the
quarter section impinged upon the river, at a point near
the center of the line, and thus divided that part of the
quarter which was south of the river into two separate
fractions, the east of which contained one and eighty-seven
hundredths acres, and the west five and seventeen hun-
dredths acres, the latter of which was the subject of the
suit; while by a survey made in 1844, the west fraction
was found to contain thirteen and twenty-three hundredths
acres, and the south line was located so far north as to leave
Lindsey's house entirely south of the quarter.

On this point, the learned judge says : " The order for
this new survey, emanated from the commissioner of the
land office June 1st, 1844, and the survey was actually made
in the autumn of that year, five years after Lindsey's entry
and five years also after his death ; and there is no proof

SMILEY *v.* SAMPSON.

whatever that any of his heirs had notice of this survey, or of any intention on the part of the commissioner, to set aside Lindsey's entry, but the whole proceeding was *ex parte.*"

Two proceedings were had by the commissioner; one setting aside Lindsey's entry, which was done summarily and without any notice to, or appearance by the parties in interest, and the other ordering and causing to be made the new survey, which was also without notice. I think that we are particularly concerned here only with the first; but that is a distinction which does not seem to have been observed in the opinion, and is not material to our present purpose. So that it appears that as to the facts of the case cited, the distinction taken between it and the one here, is sustained. The cases upon which the learned judge placed his decision, are distinguishable from this in the same respect.

The first of these cases is *Cunningham* v. *Ashley*, 14 *Howard*, 377. In 1824, Cunningham applied to locate a Cherokee warrant on land previously taken by a New Madrid certificate. The application seems to have been instantly rejected, because of this prior location. In 1831, Cunningham claimed a right of preëmption in the land. He made proof to the officers of the local land office, of his improvements, and tendered the required price. This application was also rejected for the same reason. Appeals were taken to the commissioner of the general land office, to the secretary of the treasury, and the attorney general, all of which resulted in a denial of the claim. After all this, preëmption entries were allowed to Plummer and Beaubean, upon the land in question, and they conveyed to the persons holding under the New Madrid location. These two entries were allowed to carry out some agreement between these parties and others; so that Cunningham could not have been a party to the agreement, nor to

the act of the officers in allowing these entries. His own two several applications appear also to have been rejected summarily, and without the intervention before the land office, of the claimants under the New Madrid location. Of course the preëmption claims of Plummer and Beaubean were not presented, for they had no inception until afterwards. This brief statement shows that the proceedings in the land department from first to last were *ex parte.*

In *Garland* v. *Wynn*, 20 *Howard*, 6, Mr. Justice.CATRON, delivering the opinion of the court, says : "In November, 1842, William Wynn, the complainant below, proved that he had a preference of entry to the quarter section of land in dispute, according to the act of 1838, and his entry was allowed. In February, 1843, Samuel Hemphill made proof that he had a right of preëmption to the same land under the act of May 26, 1830. The two claims coming in conflict, it was decided by the register and receiver at the local land office, that Hemphill had the earlier and better right to enter the land, and in this decision the commissioners of the general land office concurred. The learned judge states the matter thus : "The question is, have the courts of justice power to examine a contested claim to a right of entry under the preëmption laws, and to overrule the decision of the register and receiver.confirmed by the commissioner, in a case where they have been imposed upon by *ex parte* affidavits, and the patents had been obtained by one having no interest secured to him in virtue of the preëmption laws, to the destruction of another's right, who had a preference of entry which he preferred and exerted in due form, but which right was defeated by false swearing and fraudulent contrivance, brought about by him to whom the patent was awarded." He then answered this question in the affirmative, laying great stress upon the *ex parte* character of the proceedings.

From the statement in the first part of the opinion, it

would appear that there was a contest before the land office between the two claimants there present. But the manner in which the question is put and answered shows that this could not have been the case, or at least not to the extent of subjecting witnesses to an oral examination, in presence of the adverse parties, and to a cross-examination, which is of the essence of a judicial inquiry.

The next case cited is that of *Lytle* v. *Arkansas*, which was twice before the court : the first opinion being reported in 9 *Howard*, 154, and the second in 22 *Howard*, 193. In this case the entry by Cloyes under consideration was made before the grant by congress to Gov. Pope, against which it was alleged, and therefore must have been *ex parte.* So in fact it is expressly stated to have been "that Cloyes in his lifetime, by his own affidavit and the affidavit of others made proof of his settlement on and improvement of the above fractional quarter section, &c." The entry was finally decided against, because these *ex parte* affidavits were false.

This review shows that the cases relied upon to support our jurisdiction, involved the examination of the record findings and decisions of the land office, in proceedings which were there simply *ex parte.* In the case which we are here considering, such is not the fact. The examination of the right of preëmption as claimed both by Smiley and by Sampson, was had, upon notice to the parties, who appeared personally, and by counsel produced each his witnesses in support of his own and in opposition to his adversary's rights, which witnesses were, in presence of the officers and the parties, subjected to oral examination and cross-examination, and arguments very voluminous and exhaustive were filed by counsel for the instruction of officers.

The register and receiver of the local office, and their superiors in the land department, form a special tribunal for some purposes and to a certain extent. The eleventh

SMILEY *v.* SAMPSON.

section of the act of 1841 (5 *U. S. Stat. at Large*, 456), provides " that when two or more persons shall have settled on the same quarter section of land, the right of preëmption shall be in him or her who made the first settlement ; provided that such persons shall conform to the other provisions of this act : and all questions as to the right of preëmption arising between different settlers, shall be settled by the register and receiver of the district, within which the land is situated, subject to an appeal to and revision by the secretary of the Interior of the United States." This act seems to me to be very clear.

This statute vests a power in the officers named to settle, that is, to finally determine certain questions. . Over these questions, they have jurisdiction ; and their judgment thereon is conclusive.—*Allen* v. *Blunt*, 3 *Story C. C.* 742. The power to hear and determine a question is jurisdiction. It is *coram judice*, whenever a case is presented which brings this power into action.—*United States* v. *Arredends*, 6 *Peters*, 709. This power may be exercised according to the rules of the common law, or by special direction, or informally.—*United States* v. *Ritchie*, 17 *Howard*, 525. The cases upon this class of officers are all to the same effect.

The first I have noticed is *Brown* v. *Jackson*, 7 *Wheaton*, 218. The board of commissioners composed originally of the secretary of state, secretary of the treasury and attorney general, and afterwards of three persons appointed by the president, by and with the advice and consent of the senate, was authorized and required " to adjudge and finally determine upon all controversies arising from such claims as aforesaid, which may be found to conflict with and to be adverse to each other."—3 *U. S. Statutes at large*, 117, § 2. The court, Chief Justice MARSHALL delivering the opinion, held that the award of the commissioners upon questions submitted to them, under the act, is final and conclusive. In *Foley* v. *Harrison*, 15 *Howard*,

443, the entry which was subject to examination was made under the preëmption law, and had been suspended for reasons not necessary here to notice. An act of congress was passed, providing, "that the commissioner of the general land office be and is hereby authorized and empowered, to determine upon principles of equity and justice as recognized in courts of equity, and in accordance with general equitable rules and regulations, to be settled by the secretary of the treasury, the attorney general, and commissioner conjointly, consistently with such principles, all cases of suspended entries, now existing in said land offices, and to adjudge in what cases patents shall issue for the same." Under this act, the commissioner reported to the secretary among others the entry in question as adjudicated by him favorably to the claimant, and as entitled to be patented; and this report was agreed to by the secretary and attorney general. Mr. Justice McLEAN delivered the opinion of the court, and dismissed the matter which we are now considering, with these brief words, " as this decision was made by a special tribunal with full power to examine and decide, and as there is no provision for an appeal to any other jurisdiction, the decision is final within the law."

*Haydell* v. *Dufrene,* 17 *Howard,* 23, turned upon the question of the conclusiveness of a division of lands made under an act of Congress, 2 *Statutes at large,* 619–663, which provided, "that every person who, &c., shall be entitled to a preference in becoming a purchaser of any vacant tract of land, adjacent to and back of his own land, &c., and the principal deputy surveyor, &c., is hereby authorized, &c., to cause to be surveyed the tract claimed by virtue of this section.' And in all cases where, by reason of bends in the river, &c., and of claims of a similar character, each claimant cannot obtain a tract equal in quantity to the adjacent tract already owned by him, to divide the vacant land applicable to that object between the several claim-

ants, in such a manner as to him may appear most equitable."

Mr. Justice CATRON delivered the opinion of the court, and said :  " Congress contemplated that these lands should be divided among front proprietors by a surveyor on the grounds, aided by his principal ; these officers were bound to act according to their best judgment, and decide as judges on the equities of these claimants ; nor could the courts of justice interfere to control their acts, if they were honestly performed."

In *Cousin* v. *Blaac's Exc.*, 19 *Howard*, 202, the statute, (3 *U. S. Statutes at large*, 708, § 4,) which was the subject of consideration, provided, "that the registers and receivers of the public moneys of the said respective districts, &c., shall have power to direct the manner in which all lands, &c., shall be located and surveyed, and also to direct the location and manner of surveying all the claims to lands recognized, &c., having regard to the laws, usages and customs of the Spanish government on that subject, &c. ; and that in relation to all such claims which may conflict, or in any manner interfere, the said registers and receivers of the public moneys of the respective districts shall have power to decide between the parties, &c."

Mr. Justice CATRON delivering the opinion of the court, says :  " It rested with the register and receiver to ascertain the location of the land confirmed to Cousin from the evidences of claim recorded and filed with the register, and having decided where and how the land should be located and surveyed, the courts of justice cannot reverse that decision."

Many other cases might be cited to the same effect ; but these are enough to show that the Supreme Court of the United States holds land officers to be special tribunals, whose decisions are conclusive between the parties, upon certain questions and matters.   What are these questions

and matters? Obviously, such as are by the statute submitted to them for their decision. The statute says that "all questions as to the right of preëmption arising between different settlers shall be settled by these officers." Not every question, but such only as arise between different settlers, and such only as relate to the right as between themselves, to purchase the one before the other. It is evident that there are questions which are not of this character, which may arise between one of the settlers and the government, as for instance : whether the land is subject to entry under the preëmption laws ; whether the claimant is entitled to the benefit of the act, &c., &c. These questions do not arise between the two adverse claimants, and are not to be settled by the land officers. And this is made yet more clear, from a consideration of the first clause in the section ; "when two or more persons shall have settled on the same quarter section of land, the right of preëmption shall be in him or her who made the first settlement." After this provision, vesting the right in one of the claimants, and in immediate connection with it, it is said that all questions arising between these two claimants, as to this right thus vested, shall be settled by the land officers. Evidently the questions involve their relative and respective rights as compared the one with the other. And then again, the proviso, that the person in whom the right is vested by the first clause, shall conform to the other provisions of the act, that is, that he shall do such things as are required of all preëmptors, shows that such questions only are submitted to the decision of the officers.

There are provisions of the act, which if a party does not answer to, exclude him from its benefits, and yet to which you would not say he must conform. For instance, land excepted from the act by special limitations cannot be preëmpted by any one, and yet you would not say of it, that a claimant did not conform to the act in that particular.

SMILEY *v.* SAMPSON.

It is thus apparent that the proviso relates to a class of inquiries, which may arise between the claimants, but not to a class of inquiries which can arise between only one of the claimants and the government. It is the former class of questions and not the latter, which are submitted to these officers for their determination.

We have now shown that questions arising between the settlers, in determining which one of them shall have the preference in the purchase of a tract claimed by both, are submitted to the judgment of the land officers, to the exclusion of a re-examination by the courts, but that other questions are not so submitted. An examination of the act will show that the first class of questions are confined to these subjects ; namely, the settlement and the priority of settlement upon the tract, and the improvements and their character, extent and value, as indicative of the *bona fides* of the alleged settlement made by each of the claimants. For the act says that the right shall be in the first settler, and the officers shall settle the questions arising between the settlers, the most important of which must be the priority of the one or the other on the tract. So too, the act says the first settler must conform to the provisions of the act. These provisions are, that the claimant shall have "made a settlement in person upon the tract," and inhabit and improve the same, " and erect a dwelling thereon."

In determining the questions of settlement, inhabitancy and improvements, it is evident that an inquiry into and determination of their *bona fides* is necessary, in order to adjudge upon the claims of the parties respectively. These are all questions of fact, of precisely the nature of such as in a common law trial are submitted to a jury. The questions arising between the settler and the government are of a different nature. One of the limitations specified in the act is, that lands included within the limits of an incorporate town shall not be preëmpted. Here is no question

of fact as such, to be determined. The act of incorporation, or such other proceedings as may have been had to create an incorporation, is presented, and the judge and not the jury determines its validity, and the extent of territory brought within the municipal jurisdiction. Or, to take another instance. The act excludes from its operation, lands included in a reservation for military, or Indian, or other purposes. Here the law, or proclamation or treaty making such reservation is presented, and on it the question of reserve or no reserve is submitted. This obviously is a question of law. If we go through the whole statute, we will find that aside from questions of settlement, inhabitancy, cultivation and improvement, all the questions arising upon a claimant's right under the act, partake of the nature of questions of law, or of law and of fact together, and in a common law trial, would be reserved by the judge for his own rulings.

The intention of congress and its great wisdom in these beneficent provisions is brought out clearly to view by these considerations. Nothing could be so proper as to submit to the land officers the questions of fact, touching settlement and improvement; but nothing could be so ill-advised as to entrust to them the determination of questions of law, such as we have instanced. They are generally men of intelligence in the ordinary business of life, but not trained by study or experience to the habits of investigation required of judicial officers. They are good material for juries. They are not fit for judges. This view is confirmed by the adjudged cases.

The case of *Wilcox* v. *Jackson ex dem. M'Connell*, 13 *Peters*, 498, arose out of a preëmption entry, allowed by the register and receiver, of a tract of land on which was a military post, called Fort Dearborn, and which tract had, as was claimed, been reserved for military purposes. Mr. Justice BARBOUR, delivering the opinion of the court, says:

SMILEY v. SAMPSON.

"Before we proceed to inquire whether the land in ques-
tion falls within the scope of any one of these prohibitions,
it is necessary to examine a preliminary objection, which
was argued at the bar; which, if sustainable, would render
that inquiry wholly unavailable. It is this, that the acts
of congress have given to the registers and receivers of
the land offices, the power of deciding upon claims to the
right of preëmption, that upon these questions they act
judicially. Now, assuming that the decision of the register
and receiver, in the absence of frauds, would be conclusive
as to the facts of the applicant being then in possession,
and his cultivation during the preceding year, because
these questions are directly submitted to them, yet if they
undertake to grant preëmption in lands in which the law
declares they shall not be granted, then they are acting
upon a subject matter clearly not within their jurisdiction;
as much so as if a court whose jurisdiction was declared
not to extend beyond a given sum, should attempt to take
cognizance beyond that sum."

In *Doe ex dem. Barbarie* v. *Eslava*, 9 *Howard*, 421, this
question was presented upon a decision made by the register
and receiver, under an act which provided that "in all such
claims which may conflict or in any manner interfere, the
said registers and receivers of public moneys of the respec-
tive districts shall have power to decide between the par-
ties," &c. In a preceding clause of the same section of
the same act it is provided that "they shall have power to
direct the manner in which all lands claimed shall be
located and surveyed." Mr. Justice WOODBURY delivered
the opinion, and on this point said: "We do not consider
that the act"     *     *     "meant to confer the adjudica-
tion of titles of lands on registers and receivers.—7 *Peters*,
94. Those officers are not usually lawyers, and their func-
tions are in general ministerial rather than judicial. Some-
times, as in the case of preëmptioners, they are authorized

to decide on the fact of cultivation or not; and here from the words used no less than their character they must be considered as empowered to decide on the true location of grants or confirmations, but not on the legal and often complicated questions of title, involving also the whole interests of the parties, and yet allowing no appeal or revision elsewhere.

" The power given them as before quoted, is to decide only how the lands confirmed shall be located and surveyed. The further power to decide on interfering or conflicting claims should apply only to the location and survey of such claims."

In *Tate* v. *Carney*, 24 *Howard*, 357, the same statute came up for consideration upon the same question, and the ruling was as in the last above cited case.

I shall not refer to other cases, although they are very numerous. I do not think anything need be added to the decisive and well considered opinions of the eminent judges who · pronounced these judgments. However they state the proposition, whether as a question of jurisdiction of the land officers, or of construction of the statutes, it rests ultimately upon the distinction stated above. These cases hold the findings of the land office upon the question of fact touching settlement and improvement to be conclusive; but to decisions upon questions of law as whether the land is subject to preëmption, they do not award the same credit or effect.

I wish to make one observation here. In construing the 11th section of the act of '41, I limited the questions submitted by the officers in the last clause by the preceding clause, which gave the right to the settler first in time.

This is precisely what was done by the court in construing the 4th section of the act of '22, in the case of *Doe* v. *Eslava*, and was also done by the same court in the case of the *United States* v. *Perchman*, 7 *Peters*, 51. I no-

tice this because the cases are in this particular, on all fours.

What were the questions decided by the land officers in this case? On the 24th of January, 1862, the commissioner of the general land office addressed a letter to the register and receiver of public moneys of the Omaha land district, ordering them to make a new and full examination into the respective claims of Smiley and of Sampson, on four points, namely : "first, the date of settlement ; second, the nature and purposes of the same ; third, the nature and extent of the improvements ; and fourth, the date and duration of the residence" of each settler.

On the 9th of June, 1862, this examination commenced before the register and receiver, and was very full and greatly protracted ; and resulted in an unqualified decision by these officers in Smiley's favor, upon each one of those questions. Sampson appealed to the commissioner, who, on the 9th day of October, affirmed the report of the local officer. Sampson appealed again to the Secretary of the Interior, who, on the 11th day of July, 1863, reversed these decisions, and awarded the land to Sampson. The sole ground of the secretary's decision, is the fact that Smiley had, in 1857, filed on another tract of land and was by the act of March 3d, 1843, 5 *U. S. Statutes at large*, 619, forbidden to file on another tract. He did not question the decision of his subordinates, upon either of the four points to which their investigation was directed. Now upon this state of the record, it is proper to observe in the first place, that the matter on which the case was determined by the Secretary, was not referred to the local officers at all ; it was not an issue to be tried, and it was not tried before them ; the Secretary's decision on it was therefore *ex parte*, and comes within the case of *Lindsey* v. *Hawes*, cited above, and the other cases of the same class. But, furthermore, all the questions of settlement and cultivation arising

SMILEY v. SAMPSON.

between Smiley and Sampson were determined by the local officers and the commissioner in favor of the former, and those decisions stand unreversed. In fact, as the Secretary in his decision did not advert to the findings on these findings of settlement and improvement, and placed his ruling on another and disconnected ground, we are to presume that on those questions, he concurred with his subordinates. —*Cunningham* v. *Ashley*, 14 *Howard*, 383. Upon the principles established above, we are constrained to adopt the same view, and the whole case is narrowed down to the proper construction to be placed upon the act of '43.

This is a question of law, upon which we are bound by no opinion of the officers. Our inquiries are to be entirely independent of such opinion, except as the reasons assigned by the Secretary, and his high official position, entitle it to respect.

When we say we are constrained to adopt the judgment of the land officers upon the four questions enumerated by the commissioner in his letter of the 24th of January, 1862, we do not mean to intimate that we doubt its correctness. We do not. Smiley's account of earning the means and of the purchase of the materials with which, and the manner in which, he made the improvements on the tract, is too specific, clear and decisive to be questioned. The alleged discrepancy about the place in Virginia where he taught, is of no consequence, as he is shown to have taught near there. The material question is, did he earn the money by teaching? and disinterested witnesses show that he did. His statement, too, showing that he was the head of the family, and that the large family, consisting of an aged father and four sisters, who were dependent to a large extent upon him, is unquestionably true. Patrick, who swears to the contrary, does not commend himself by his candor, and evidently is trying to sustain his own, or, as he prefers to put it, his wife's interests. His statements can-

not over-ride Smiley's, whose account of the matter we believe throughout. His testimony as to the continuance of his residence on the tract, we think, is quite sufficient. The house remained occupied by him or his tenant continuously. Here was his home when teaching in Iowa, when freighting in the Platte Valley, when his sisters after his father's death were removed to Omaha, and here his father's grave is to this day. His absences were doubtless occasioned by the efforts he had to make to support those who, for a long time, were dependent upon him. They cannot deprive him of the rights which would not have been strengthened under the law, by unintermitted residence. We are satisfied with the findings of the land officers, and adopt them as ours, not only by virtue of a rule of law, but as our own convictions.

We are now brought to the consideration of the one question of law which was decided by the Secretary of the Interior, against Smiley.

The facts as shown by Smiley and undisputed, are these : Smiley came to Nebraska in 1857, and settled upon the lands now in question. Being desirous of securing lands under the preëmption law of September 4, 1841, he made search for a proper tract, but experienced difficulty in finding one, because all the lands in the vicinity were claimed under the protection of the claim club. This club was an organization composed of some hundreds of leading citizens, which, by force in certain cases — by the use of most violent force — prevented new comers into the territory, taking under the act of congress, lands which its members claimed, not by virtue of any actual possession, but simply by joining it and entering on its records a minute of their claim. These claims were 320 acres in extent, in opposition to the law which permitted a settler to take only 160 acres. The organization in its objects, measures and operations was flagrantly illegal and vicious. Smiley,

however, did find a tract of land, which was unoccupied, and unimproved, and accordingly filed with the register of the land office his written declaration of intention to pre-empt it. Before he had made any improvements or done any other act, one Creighton who seems to have held considerable bodies of land in the same way, came to him and told him he held the land under the claim club, and required him to withdraw his filing and claim thereto at once, under pain of being taken in hand by that violent and illegal association. Smiley being unacquainted with these usages of the frontier, and with his rights under the law, and desirous of avoiding any such trouble as he was thus threatened with, readily withdrew his filing, did not again assert any claim to the tract, and it was afterwards preëmpted by another party. Such in brief are the facts. The statutes bearing on this question are these :

The 15th section of the act of 1841, is as follows : "Whenever any person has settled, or shall settle and improve a tract of land subject at the time of settlement to private entry, and shall intend to purchase the same under the provisions of this act, such person shall in the first case within three months after the passage of the same, and in the last within thirty days from the date of such settlement, file with the register of the proper district, a written statement describing the land settled upon, and declaring the intention of such person to claim the same under the provisions of this act ; and shall, where such settlement is already made, within twelve months after the passage of this act, and where it shall hereafter be made within the same period after the date of such settlement, make the proof, affidavit and payment herein required ; and if he or she shall fail to file such written statement as aforesaid, or shall fail to make such affidavit, proof and payment within the twelve months aforesaid, the tract of land so settled and improved shall be subject to the entry

[S. C. N.]     6

of any other purchaser." This is the only provision in that act requiring a declaratory statement to be filed.

It will be at once observed that the lands upon which the filing is to be made under this act, are only such lands as are subject to private entry. The provision is, "Whenever any person has settled, or shall settle and improve a tract of land subject at the time to private entry." The requirement was limited to lands of that single class intentionally, for some reason which seemed good to congress; for the preceding section relates to lands not subject to private entry, providing that the proof and payment shall be made before the public sale. Congress had before its attention the two classes of lands, and when it required the filing of the statement, did so only in respect of one class, and designedly did not do so in respect to the other.

The lands here in question were not at the time of Smiley's filing subject to private entry. The facts about that filing are these : In June, 1858, he offered his filing to the register of the land office, but that officer refused to receive it, because the land had been previously entered under the act of '41, by one Mowrey, although the register had previously decided against the validity of that entry. On the 24th of July following, Smiley filed a *caveat* against Mowrey's entry, whereupon the commissioner ordered a second investigation of its validity, which examination commenced on the 13th day of December, 1858, and was protracted till the 3d day of May, 1859. These proceedings were entitled "*John A. Smiley* v. *James A. Mowrey;*" the result was a decision of the register and receiver adverse to Mowrey's claims, which they communicated to the commissioner by letter under date of May 19th, 1859. A third and fourth trial before the local officers was had, and then came on the investigation upon the four points enumerated above, as directed by the Commissioner in his letter of the 24th of January, 1862. At this last trial,

SMILEY *v.* SAMPSON.

Smiley offered and caused to be inserted in the record, a declaratory statement dated back to his previous offer in 1858, and as a copy of the one then offered and rejected. The declaratory statement offered by Smiley in June, 1858, should have been received and filed by the register. His excuse for his refusal was insufficient. Mowrey's entry was palpably fraudulent and clearly void. He had himself so decided. That entry did not take the tracts out from the body of the public lands. It was subject to the claim of any other person.

It is a well established principle, that where an individual in the prosecution of a right, does every thing which the law requires him to do, and he fails to attain his right, by the misconduct or neglect of a public officer, the law will protect him.—*Lytle* v. *Arkansas,* 9 *Howard,* 333.

Smiley did all that was required of him in June, 1858, when he prepared and offered to the register to be filed his declaratory statement claiming these lands, under the preëmption law. The officer was guilty of misconduct in refusing to receive the paper. Smiley must be protected by law. But this is not all. From this time forth, he pursued this land, immediately filing a *caveat* against Mowrey's entry, which, by pretense of the land officer was made to stand in his way, and then by successive investigations, avoiding that entry, proving clearly his own right, and following, to this hour, what must at times have seemed to him an *ignis fatuus.* He could not have done more, if his filing had been accepted. The want of it under the circumstances did not seem in all these successive proceedings in the land office, to have prejudiced his rights. We are therefore to regard him as filing on the land in June, 1858.

Lands do not become subject to private entry until they have offered at public sale, under the proclamation of the president. Of these public sales the courts take judicial notice. The first public sale of any lands in Nebraska, did

·not take place until July 5, 1859. At the time of Smiley's filing, these lands were not subject to private entry. The 11th section of the act of '41, therefore did not apply to them.

On the 3d day of March, 1843, congress passed an act entitled "An act to authorize the investigation of alleged frauds under the preëmption laws, and for other purposes;" the 4th and 5th sections of which are as follows:

"§ 4: And be it further. enacted, that where an individual has filed under the late preëmption law, his declaration of intention to claim the benefits of said law for one tract of land, it shall not be lawful for the same individual at any future time to file a second declaration for another tract.

"§ 5. And be it further enacted, that claimants under the late preëmption law, for land not yet proclaimed for sale, are required to make known their claims in writing to the register of the proper land office, within three months from the date of this act, when the settlement has been already made, and within three months from the time of settlement, when such settlement shall hereafter be made, giving the designation of the tract, and time of settlement; otherwise his claims to be forfeited, and the tract awarded to the next settler in the order of time, on the same tract of land, who shall have given such notice, and otherwise complied with the conditions of the law."

This 5th section is the first and only provision of law requiring the filing of a statement in writing of a claim to the land, on the part of the preëmptor of unoffered land. It was under this section, that Smiley filed on these lands.

The 4th section relates to lands upon which by the act of '41, a preëmptor was required to file, which lands, as we have seen, were only such as were subject to private entry. The prohibition of the law in a second filing is therefore confined to those lands. The lands here in question not

belonging to that class, the prohibition did not relate to them. Smiley did not infringe the law, by making a second filing. The reason for the distinction between offered and unoffered lands, for prohibiting a second filing upon lands subject to private sale, and not doing so upon lands not subject to private sale, is obvious upon a moment's consideration. Parties purchasing government lands at private entry, do not generally go to the land and personally examine them. They go to the land office for information, where an examination of the plats shows the general character and locality of the lands; almost always they select the lands which they desire from information thus derived. If they were to find a tract, which, from such information, seemed desirable, but which had been already claimed by a party under the preëmption laws, they would naturally decline to take it. If a person could file on several pieces, he would prevent purchasers from entering them, and sales would be greatly retarded and interrupted. As the government by placing the lands in market, indicates thereby its desire to sell, the filing by one person on several tracts, operates to thwart the desires and obstruct the interests of the government. Here is a palpable mischief, which the 4th section of the act of '43 was designed to prevent.

On the other hand, unoffered land can only be purchased by preëmption, and can only be preëmpted by a settlement and residence on the tract, which must, or at least should precede the filing; for it is required to state the day of settlement. Of course this necessitates a personal knowledge of the tract; and whether or not it has been previously settled upon by another. On going to the land office the claimant finding a prior filing, knows whether it will stand in his way; for, unless supported by a settlement, it will be of no consequence. The prior filing unsupported by settlement will not prevent his proceeding to secure the

SMILEY v. SAMPSON.

tract, by compliance with the law, and so he is not injured. Nor is the government injured. It has not placed these unoffered lands in market, but reserves them for actual settlers. No injury is therefore sustained by one man's filing on more than one tract of such land. I think this is the reason for congress making the distinction between the two classes of lands, which has been pointed out above, in well considered and carefully framed statutes. It seems clear to me that there is no prohibition in them or either of them of a second filing on unoffered lands; and therefore the fact of Smiley's filing in 1857, did not affect his right or capacity to secure to himself the benefits of the act of '41, when he filed on the lands here in question in 1858.

There is another view of the matter which may be taken, and which conducts to the same result. The act of '43 was passed to suppress certain frauds and mischiefs which had grown up under the preëmption laws. Its title, the most of its provisions and its whole frame indicates this. One of the frauds doubtless was the very one which is aimed at in the 4th section noticed above; that is, of persons filing declaratory statements upon several parcels of offered lands, whereby the government sales were retarded, and these persons were enabled to extort from others, desiring to purchase, sums of money, in order to remove the obstruction thus interposed. The facts of Smiley's first filing and his withdrawal of all claim to the land, so at that time claimed by him, as they appear in the record and as they are stated above, show, very clearly, that he did not do what he did for any fraudulent purpose, nor to speculate in the public lands; nor did any injury result to the government. On the other hand, he did what he was justified in doing; what any prudent man would have done under the circumstances. The government could not protect him in his rights against this violent and illegal claim club;

and it cannot now turn around and say, because it failed of its duty in furnishing the protection to which he as a citizen was entitled, he shall suffer.

The act of '43 was passed to suppress frauds, and Smiley's case is not within the mischief aimed at.

It is a just, reasonable and necessary rule of statutory construction, that the general words of a law are to be restrained where it is clear that they were not intended to extend to a particular act or thing.—*Grotius de Equitatu, C.* 1, *sec.* 3, 2 *Just.* 43, 83. In fact statutes are to receive at times a construction which may seem contrary to the letter. The reason assigned is, that the lawgiver could not set down everything in express terms, so as to meet all the various exigencies of human affairs, and is by the necessity of the case, compelled to use general terms, which include in their natural significance many cases which were not in the intention of the law-maker. So when such a case arises, when it is clearly out of the mischief intended to be guarded against, being out of the spirit of the law, although within its letter, it is the duty of the judge to limit the terms employed. The case of *Jackson* v. *Collins*, 3 *Cowen*, 89, furnishes an apt example. The statute prohibited any sheriff or other officer, to whom any execution should be directed, or any of their deputies, or any one for them or either of them, to purchase any goods or chattels, lands or tenements at any sale by virtue of any execution, and declared all purchases made by them, or any of them, void. The premises in question in that case, which was an action of ejectment, had been sold by one deputy sheriff, on an execution issued under a judgment owned by another deputy of the same sheriff, and was bid off by a third person, in his own name, but in fact, as it was claimed, for the deputy who owned the judgment, and was subsequently conveyed to him by the purchaser. It was contended that the purchaser was trustee of the deputy, and purchased the land

SMILEY *v.* SAMPSON.

for his benefit, and that for that reason the purchase was void. SAVAGE, Ch. J., held that although the purchase came within the letter of the act, it could never have been the intention of the legislature to have prevented a deputy sheriff, when he was plaintiff in an execution from bidding in order to secure his money. " The object was to prevent abuse — that the sheriff or his deputy should not be allowed to become purchasers at their own sales, and thereby be induced to conduct corruptly in relation to them. But surely it was never intended to place those persons in a worse situation than others as to the collection of their own demand. ' Whenever the intention of the makers of a statute can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such may seem contrary to the letter.'—*Bac. ab. til. Statute* ( *I* ) 15 *John.* 386, *per Ch. J.* THOMPSON. A thing which is within the letter of the statute, is not within the statute, unless it be within the intention of the makers."

The same rule was applied in the case of *The Mayor, &c. of New York* v. *Lord,* 18 *Wendell,* 131. The statute provided that when any building or buildings in the city of New York, should be on fire, the mayor might direct or order the same to be pulled down or destroyed, and that upon the application of any person interested in any such building, a jury should be called to inquire and assess the damages which the owner of such building, or any person having any estate or interest therein, had sustained by the pulling down or destroying thereof. During the great fire in December, 1835, a building owned by Rufus L. Lord, and occupied by David N. Lord as tenant for a year, from May 1, 1835, had been destroyed by being blowed up by the order of the mayor, to prevent the spreading of the conflagration. The tenant, D. N. Lord, had a large amount of goods in the building which were destroyed with it. He applied under the act for a jury, who assessed the

damages of the owner at $7,168.50, and of the tenant as lessee and for his goods, at $156,274.50. The question was, whether the tenant was entitled to the indemnity under the act. Chancellor WALWORTH in delivering the opinion of the court, said: "In the language therefore, of an eminent Scotch civilian, 'when the strict letter of the law seems contrary to its spirit or to equity, judges ought not so much to regard the proper or received signification of the words, as that meaning which appears most consonant to the design of the law.'—*Ersk. Inst.* 81, *tit.* 1, § 52. And he bids fairest for a just interpretation, who keeps constantly in view the mischiefs, or defects which existed in the former laws, on the same subject, the remedies which the statute has provided to cure them, how far those remedies are proper, and what sense appears most congruous to its subject matter and most agreeable to equity. —*Idem.* § 58.

"In relation to the subject under consideration in this case, the defects which existed in the common law were, that where it might become necessary for the officers of the corporation to destroy property of an individual to prevent the ravages of a fire, no provision was made for compensating the individual for his private property, which was taken for the benefit of others, notwithstanding the officers were protected from personal liability, when they could show that the destruction of the property was necessary to produce the effect. They were, at the common law, bound at their peril to decide correctly as to such necessity, to protect themselves from liability to make good the loss. Although the legislature seem to have supposed that it was only necessary to give to the officers of the corporation a discretionary power to pull down or destroy buildings, to arrest the progress of the fire, it can hardly be presumed that they did not intend to extend this protection to the officers, as well as the compensation to the indi-

vidual, whose property was thus taken or destroyed, to all cases of destruction which were the necessary consequences of a correct and judicial exercise of the power expressly given by the statute.          \*          \*          \*

"The terms of the act appear sufficiently broad to give to the owner or lessee of the building an assessment of all the damages he has sustained by the pulling down and destroying of such building, without giving him an opportunity to remove his goods therefrom. In such a case the loss of the goods may be as legitimately considered a damage sustained by the destruction of the building, as the loss of the building itself. Both are equally within the spirit and equity of the statute, and no reason can be assigned why the individual whose property is thus taken and destroyed for the preservation of the city, should not be compensated as well for one part of the injury as for the other.—*Durraussean* v. *U. S., Cranch,* 307 ; *U. Fisher,* 2 *Cranch,* 358 ; *Lessees of Brown* v. *Plougher,* 14 *Peters,* 178.

Many other cases both in England and America might be cited in support of this view. And so it is at the civil law. Dornet says (*C. I. til. I.* § 2.), "where the hardship or rigor of the law be not the necessary consequence of and inseparable from it, but the law itself may have effect by an interpretation which mitigates its rigor, courts may, as the spirit of the law requires, depart from the rigor which the letter of the law seems to demand, and follow rather its spirit and true intendment, rather than adhere to a strict and rigid interpretation."

St. Germain is thus quoted in Doctor and Student, 16 : "In some cases it is necessary to leave the words of the law and follow that which reason and justice requireth ; and to that intent, equity is ordained, that is to say, to temper and mitigate the rigor of the law ; and so it appeareth that equity taketh not away the very right, but only that which seemeth to be right by the general words of the law."

Puffendorf thus expresses it : "A true equitable construction consists in showing by principles of natural good sense, that a particular case is not comprehended in the meaning of a law, because if it were so comprehended, some absurdity would necessarily follow." Applying this rule of statutory construction to this case and our view above expressed is fully supported. If the two acts of '41 and '43 taken together do in words forbid one person to file twice a declaratory statement, as well on unoffered as on offered lands, because by doing so the United States or third party are in some way injured, yet these words would be restrained so as to except from their otherwise harsh and rigorous effect, the case of a person, who was, by some power which he could not resist, compelled to abandon all the advantages of his first filing. Unless the case be taken out of the operation of the words of the act, the absurdity occurs of passing a beneficent statute for the benefit of a meritorious person, and then, for no fault of his, depriving him of that benefit. A law passed to suppress frauds is made to operate oppressively upon a party, who has not voluntarily infringed it, and whose conduct has injured no one.

There is another consideration which I will simply advert to. Throughout this Territory in 1857, and 1858, and 1859, persons did file a second and even a third declaratory statement, upon unoffered lands. They were encouraged to do so, by the land officers, who received one dollar for every filing; and these officers were directed by the commissioner of the general land office, to permit this practice, and to permit parties making a second filing, to withdraw the former one. I do not think the officer of the goverment can by such a course, put a certain construction on the law, and then when a party has been misled by it, ignore the rule he has made. That savors too much of a fraudulent

device, to be accepted as the practice of an enlightened and free goverment.

The honorable Secretary was clearly wrong in holding that Smiley exhausted his right under the preëmption law, when in 1857, he filed on one piece of land, and that having withdrawn that statement under compulsion and completely abandoned the tract, he could not file on the lands here in question, and thus enjoy the privileges he had not willingly forfeited.

Another objection not much insisted upon at the bar to Smiley's entry, is made in the record, and demands a brief notice. It is that these lands had been selected as the site of a city, and so were within the exceptions mentioned in the act of 1841. The facts on this branch of the case are these : There was a company known as the Sulphur Spring Land Company, which, under the protection of this Omaha Claim Club, " claimed " some four thousand acres of land, and laid it out in town lots. By one means and another, they induced many persons to build houses on these lots. The only houses on this tract of one hundred and sixty acres, was one built by Gant, a member and at one time the president of the company, and those built by Smiley. The company could not obtain title to the lands in any way, except by hiring parties to preëmpt under the act of '41, and deed to them. This tract was in 1857 preëmpted by one Mowrey under a contract previously made with this company, to convey to it after his entry was made, for the consideration of $150. This was in violation of the law and of the oath he was required to take, when he made his entry. It was perjury on his part, and subornation of perjury on the part of the officers of this company. This was the entry which first stood in the way of Smiley's preëmption. In 1858, this company failed, and the forced enterprise of building the town was abandoned. The bubble burst.

SMILEY v. SAMPSON.

This tract never was selected as the site of a town, so as to exclude preëmptors from it. At the time Smiley claimed it, no one objected to his claim, because it had been selected as a town site.

From the case as thus made by Smiley in support of his right of preëmption of the lands in question, we must turn for a moment to the consideration of the facts shown in support of Sampson's right. Smiley claimed and instituted proceedings to secure these lands in the summer of 1858. In the following winter a trial was had in a matter entitled "*John A. Smiley* v. *James A. Mowrey*," which resulted in a decision of the local officers in Smiley's favor. The commissioner affirmed this decision. On the 21st day of August, the commissioner directed another investigation in Smiley's behalf, and at this time Sampson first appears on the scenes. He came into the case, therefore, not until after Smiley, by persistent efforts, had avoided the fraudulent entry of Mowrey. On his arrival in the Territory, without means, he rented a farm from the Creighton above mentioned, some miles distant from this tract, and rented the house thereon built by Gant. This house, it is claimed, he bought from Gant, giving him his note for $3,000. He never built any other house. Immediately after, he, under the Secretary's decision, obtained this land, he conveyed nearly the whole of it to Tuttle, the treasurer, and indirectly to Gant the president, and Patrick, the donating committee of the extinct Sulphur Springs Company, and to others, his witnesses and attorneys. We cannot doubt that this was all, as it had been agreed, when this man first asserted a claim to the tract. It was unquestionably one of those speculations, like that previously entered into with Mowrey, into which all those parties entered, or into which they were from time to time admitted, as their services seemed to be required, in the progress of these most extraordinary proceedings. They

SMILEY *v.* SAMPSON.

all evidently entered into the venture with their eyes open. Not one of them is shown to have put a dollar in, not one of them comes before us with a case having a single equitable feature. On the other hand the record shows to our apprehension as fraudulent a case as Mowrey's, except that he was shame-faced enough to leave the country as soon as these parties had paid him " his price." If it is not proven, so that parties unacquainted with the manner of doing such things in new countries can see it, to us it is perfectly clear. No injustice, no legal injury is done to these parties by taking this title from them, and conferring it upon an early settler, a *bona fide* preëmptor, and a meritorious claimant.

The decree of the District Court was right, and must be

Affirmed.